1821.

GOUVERNEUR<br>v.<br>ELMENDORF.

Decree accordingly.

GOUVERNEUR and others, Executors of GOUVERNEUR,<br>*against*<br>ELMENDORF and others.

This Court will not afford relief against a contract, because of
fraud, unless it be made a distinct ground of allegation, and be put
at issue in the pleadings.

A vendor, selling in good faith, is not responsible for the goodness of
his title, beyond the extent of the covenants in his deed.

THE defendant, *Elmendorf*, gave a bond, on the 1st *Oc-
tober*, 1802, to the testator, *N. G.*, in his lifetime, for the pay-
ment of 5,000 dollars, the one half in two years, and the
other half in three years; to secure the payment of which,
*E.* executed a mortgage on certain lands in *Ulster* county.
The bond remaining unpaid, the plaintiffs filed their bill in
*August*, 1810, for a foreclosure of the equity of redemption
and a sale of the mortgaged premises, to satisfy the debt.
The bill was taken *pro confesso* against *Ten Eyck* and *Doll,*

*October* 31,<br>1820,<br>and<br>*January* 18,<br>1821.

the two other defendants, who had purchased parts of the mortgaged premises, with notice of the existence of the mortgage. *E.* appeared and answered; and in his answer admitted the bond and mortgage, as stated in the bill, and that no part of the principal or interest of the debt had been paid, except the sum of 300 dollars, in 1815. He stated, that the debt arose from a contract entered into between him and the testator, in *May*, 1802, shortly before his death; when the testator represented to him, that he was owner of about 20,000 acres of valuable land, in the State of *Kentucky*, which had been " located and secured to him, either by sure and perfect grants, or other assurances, from the said State, or by valid locations and surveys, which entitled him to patents from the State," which he was fully enabled to convey and warrant to the defendant *E.*, except a fourth part, which was to belong to one *Humphrey Marshall*, in that State, who had been appointed by the testator as his agent to secure and perfect the title, reduce the lands into possession under that title, and pay the taxes, for a certain period, in consideration thereof. That the testator proposed to sell these lands to the defendant for 8,000 dollars; observing, that he should only require the interest of that sum to be paid, and that the principal might remain, until the defendant could obtain the amount by a re-sale of the lands: that he was induced to make the sale on account of the ill state of his health, and the infancy of his children, who would be unable to manage such a concern; and that the defendant might calculate to make a fortune by the purchase. That the defendant agreed to purchase the lands on the terms proposed by the testator; but before the contract was executed, *N. G.* died, leaving the plaintiffs his executors, with full power to carry the agreement into effect. That the defendant, afterwards, applied to the plaintiffs to fulfil the contract; and they alleging that they had better offers, with apparent reluctance, consented to take 3,000 dol-

lars in cash, and a bond and mortgage for the residue; and the defendant accordingly paid to them the sum of 3,000 dollars, and executed the bond and mortgage for 5,000 dollars, as stated in the bill. That the plaintiffs, thereupon, executed a deed to the defendant, of " all those several Land-Office Treasury Warrants of *Virginia* therein after-mentioned," (describing them,) " and all the entries and locations made by virtue of the said warrants; and all the lands and tenements situated in the States of *Virginia* and *Kentucky*, either and each of them, which may have been, or may hereafter be located, granted, held, or obtained by virtue of the said warrants, or any or each of them," &c.; with covenants of warranty against the heirs and assigns of *Samuel Beall, John May, R. I. Brands*, and *I. & N. Gouverneur*; subject only to the claims of the said *John May* and *Humphrey Marshall*, for making the entries, locations, and surveys, &c., to the extent of one-fourth of the premises. That in 1803, the defendant went to *K.*, and found the titles to the lands so conveyed very complex and uncertain; that the legal estate to a part of them was vested in the heirs of *Samuel Beall*; the said *N. Gouverneur* having only an equitable title; that there were other patents and locations which interfered with those of the defendant, all, or the greater part of which, were in dispute with persons holding adversely to the claim under *Samuel Beall*, the particulars of which were stated in the answer. That on his return from *K.*, he offered to the plaintiffs to rescind the contract, which they declined doing. The defendant, under these circumstances, insisted that he ought not to be compelled to make any further payment on the said bond and mortgage; and hoped that the aid of the Court would not be afforded to the plaintiffs to enforce a foreclosure and sale, but that the plaintiffs might be ordered to accept a reconveyance of the property, and to repay, with interest, what the defendant had paid.

A replication having been filed, proofs were taken in the

1821.

GOUVERNEUR
v.
ELMENDORF.

cause; and the material parts of the evidence are sufficiently stated in the opinion delivered by the Court.

*October* 31, 1820. The cause came on to be heard on the pleadings and proofs.

*Harison* and *B. Robinson*, for the plaintiffs.

*T. A. Emmet*, for the defendant.

THE CHANCELLOR. After a diligent consideration of the defence set up in this case, I am not able to perceive any sufficient ground for denying to the plaintiffs the ordinary remedy upon their mortgage.

The bond and mortgage charged in the bill, and admitted in the answer, were executed on the 1st of *October*, 1802. They were given to the plaintiffs, as executors of *Nicholas Gouverneur*, deceased, to secure part of the consideration upon the sale of " several land office treasury warrants of *Virginia*, and of the estate and interest of *N. G*, and of the executors, to all the lands which had, or might be located and obtained by virtue of those warrants." The answer states, that the proposal to purchase these warrants came from the testator, in *May*, 1802, and shortly before his death, and they were estimated to cover upwards of 19,000 acres of land in the state of *Kentucky*. The testator died before the contract could be consummated, and the negotiation was renewed with his executors, *upon the application of the defendant*, and it terminated in the execution of a deed by them, and in receiving 3,000 dollars in cash, and the bond and mortgage mentioned in the bill.

There is no colour for a charge of misrepresentation or fraud, on the part of the grantors. I do not understand that any such charge exists in the answer, or was intended by it, as a substantial ground of defence, though such a charge is now put forward by the defendant's counsel, as one of their points. But it is requisite that the charge of fraud should

be made a distinct ground of allegation by the party in *pleading*, otherwise, it is not to be deemed in issue, and cannot affect the contract in question. This was the clear and decided doctrine of the Court of Errors, in *James* v. *M'Kernon*, (6 *Johns. Rep.* 543.) and that case may be considered as perfectly in point, as to this part of the defence. If this were not so, yet there is nothing in the proofs to support an allegation of fraud in the testator, when he made the proposal to sell, or in the executors when they executed the deed.

1821.

GOUVERNEUR
v.
ELMENDORF.

The testator dealt in good faith. The interest in the land warrants and in the locations under them, came to him from *Robertus S. Brands*, who was naturalized in *Maryland*, as early as 1784; and in 1799, an act of the legislature of *Kentucky* was passed, to legalize the transmission of the title of *Brands* to *J.* and *N. Gouverneur*. And when the testator wrote to *H. Marshall*, his agent, on the 10th of *January*, 1796, that he was satisfied that *Brands* had a clear title, there can be no doubt that it was a declaration made in perfect sincerity. Mr. *Marshall* says, he had once offered the testator 4,000 dollars for his claims, and to run all risk as to title; but that he afterwards declined it, on the ground of the alienage of *Brands*, which objection, as it has since appeared, was without foundation. The testator, no doubt, knew that there were embarrassments as to some of the locations, and difficulties and obscurity as to parts of the lands claimed; and he had employed Mr. *Marshall* to investigate the titles. We may be satisfied, that if the titles to the whole 19,000 acres, had been ascertained and clearly established, those lands never would have been offered for sale to the defendants for 8,000 dollars. They were worth, at least, from 3 to 4 dollars an acre, in their natural state. It was, therefore, a purchase by the defendant upon speculation, and he took upon himself, at his own peril, the chance of great gain, and the hazard of some loss.

Nor is there any colour for the imputation of fraud to the executors. They knew no more of the subject, or of the goodness of the titles than the defendant, and the answer admits, that the sale was *reluctantly* made by them, at his solicitation. The vendor selling in good faith, is not responsible for the goodness of his title, beyond the extent of his covenants. The case of *Bree* v. *Holbeck*, (*Doug.* 654.) is a strong and pointed case of this kind, and quite applicable to the attempt in this case, to get rid of the payment of the consideration. The administrator, with the will annexed, in that case, found a mortgage deed among the papers of the testator, and assigned it, and it turned out to be a forgery. It was held by the K. B., that the purchaser of the mortgage could not recover back the consideration he had paid, for there was no other covenant than that the testator or the administrator had not incumbered the estate, and it was incumbent on the purchaser to have looked to the title. This decision was, afterwards, sanctioned by Lord *Kenyon*, in *Cripps* v *Reade*, (6 *Term*, 606.) and the doctrine contained in it, by the Court of C. B. in *Johnson* v. *Johnson.* (3 *B. & Pull.* 162.) by the Supreme Court of this State in *Frost* v. *Raymond*, (2 *Caines*, 188.) and by the Courts of Equity, in the cases referred to in *Abbott* v. *Allen*, (2 *Johns. Ch. Rep.* 523.) There can be no doubt that the executors dealt with perfect candour, and made all the disclosures within their knowledge; and it was pertinently asked by one of the counsel for the plaintiffs, how came the defendant in possession of the correspondence between *Marshall* and the testator, and the original letters from the former to the latter, if they were not delivered over to him by the executors?

But the subsequent acts and confirmations of the defendant do, of themselves, put an end to all objections on the ground of fraud, or misrepresentation, or a want of consideration and value, imputed by him to the purchase. Let us attend, for one moment, to a connected history of those acts.

'The negotiation for the purchase was entered into be-
tween the defendant and the testator, in *May*, 1802 ; and we
are bound to presume, that all due inquiries were made. and
all due disclosures exhibited.   The death of the testator put
an end to the negotiation.   It was renewed with his repre-
sentatives, who were under ignorance equal to that of the
defendant, as to the title and value of the subject ; and in
*October*, 1812, the deeds were exchanged. Here the defend-
ant had an interval of four or five months to reflect and
examine, and to make inquiries, and to investigate the state
and condition of the title, and the possession, condition, and
value of the lands.   After receiving a deed, he went to *Ken-
tucky*, in the spring of 1803, and had conversations with Mr.
*Marshall*, the former agent of the testator, and satisfactorily
discovered the state and situation and amount of the loca-
tions under the warrants, and the incumbrances upon those
locations by the claims of *John May* and *Humphrey Mar-
shall*, and the fact of interfering claims and locations, and of
adverse possessions.  All this appears from the answer ; and
Mr. *Marshall* says, that the defendant, upon that visit, en-
tered into " a more particular agreement" with him to carry
on the investigation in respect to the titles ; and, by that
agreement, the defendant was to do what was necessary to
establish his own title to the land, and the witness was to
prosecute and defend all suits, as to adverse claimants, at
his own expense, and to pay the taxes.  All this was part of
the new agreement between the defendant and his agent.
On the defendant's return to this State, laden with all this
knowledge, he takes a new deed from the plaintiffs, and can-
cels the former one.   The new deed is of the date of the
14th of *May*, 1804 ; and he, at the same time, executes to
the plaintiffs a bond of indemnity of the same date against
the claims of *John May* and *Humphrey Marshall*, in regard
to their agency in the premises.  This was one of the most
solemn recognitions that could have been made of the origi-
nal contract, with full knowledge, derived from the most

authentic sources, of all the circumstances belonging to the case. It would seem to be impossible, after this, for the defendant to allege. with any plausibility, fraud, or misrepresentation on the part of the plaintiffs. He ratified the bargain, after due notice and inquiry ; and afterwards, in the spring of 1805, he paid 300 dollars towards interest. And nearly three years after the ratification, he writes a letter to one of the plaintiffs, on the 3d *January*, 1807 ; and though, in that letter, he says he was " as uncertain in regard to the *Kentucky* property as at first," and that his agent had done nothing " to progress the claims which he had been so unfortunate as to take from off his shoulders" (meaning the executor) ; yet, that he " meant to have paid before this, and had done his utmost, but had not been able to raise the money ; that he expected reimbursements that winter, out of which he should pay him (the executor) as much as possible. He hopes he (the executor) will be content with receiving interest, till he can effect a sale of some property ; and thinks it will not be much of a favour for the executors to wait for the principal, till he was able to dispose of property to discharge it."

Nor is there any breach of the covenants contained in the deed to the defendant. There were no covenants, except against *R. S. Brands* and his representatives, and the representatives of *S. Beall* and of *Isaac* and *Nicholas Gouverneur*, and the persons claiming under them ; and there is no proof of eviction or disturbance under any claim derived from either of those sources. Even, if the mere failure of title was made out, it would not alter the case, or help the defendant, for he took the risk of the goodness of title upon himself. He knew with whom he dealt, and the nature of the hazardous, but flattering, speculation in which he engaged. He has no remedy, but under the express covenants in his deed ; and these covenants have not been broken. If it was in the power of the defendant, yet it would seem to be very unreasonable and inequitable for him, at this late day, and after a

lapse of 18 years, to rescind the contract, and cast back upon the plaintiffs the burthen of rescuing a title now impaired and oppressed by the great lapse of time, and the want of due diligence or skill on the part of the defendant. There is no good reason to suppose, but that vigilant and well directed efforts in the prosecution of the title of the testator, under *R. S. Brands*, if they had been commenced in 1802, and steadily and unremittingly pursued, would have saved the defendant from loss, if they did not yield him a considerable gain. The adverse possessions should not have been suffered to spread and take root, and ripen into right; and if the defendant had not voluntarily " taken the burden from off the shoulders of the plaintiffs," how can we now safely say, that *they* might not have realized a more valuable consideration ? There is no case in which a party, with knowledge of all the circumstances, has been permitted to hold to a bargain for years, and then, at last, to throw it up as unprofitable.

There has been no decision to this day, in the *Kentucky* Courts, upon the merits of the *Brands* title ; and Mr. *Marshall* says, he does not know that any of the suits brought by him, on behalf of the defendant, are affected by any of the statutes of limitation. The decision of the Court of Appeals in *Kentucky*, of the 10th *April*, 1817, turned upon a matter of evidence as to the requisite proof of the will of the testator. This was an objection rather of form than of substance, and was capable of being cured ; and the defect of proof in that case was imputable to the want of due diligence and inquiry in the defendant. And how the Court of Appeals in *K.* could say, that the deed from the plaintiffs was not executed by a majority of the executors of *N. Gouverneur*, when the deed was executed by three out of five of the executors named in the will, I am at a loss to understand. There must have been some mistake, either in the documents before them, or in the documents before me, as to that matter of fact.

GOUVERNEUR
v.
ELMENDORF.

The defendant has no right to charge the plaintiffs with the loss, if any, resulting from the sales made by the Marshal of the district of *Kentucky*, for *U. States* taxes. The lands were sold in 1805, and the deeds executed to the purchaser (who bought in large tracts, for a nominal consideration) in 1807. By the new agreement made between the defendant and *H. Marshall*, in 1803, when the defendant appeared and assumed the control of the lands; and of the interest therein, as owner, *Marshall* was to pay all taxes. It was incumbent, then, upon the defendant, or his agent, to discharge those *U. S.* taxes, or to redeem the lands. The plaintiffs were not chargeable with any duty, or with any negligence, upon that point. That task was assumed by the defendant, and conferred upon his agent ; and the petty incumbrance of *U. S.* taxes was not within any of the covenants in the deed to the defendant.

Upon the whole, whatever sympathy may be felt towards the defendant, for his losing bargain, there is no principle in law or equity to be deduced from the case, that will justify this Court in rescinding the contract of purchase, or in denying to the plaintiffs their ordinary remedy upon their mortgage.

I shall, accordingly, direct, that the usual decree for a foreclosure and sale be entered.

*Decree accordingly.*